# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **TERRANCE CLENNON** | * | **CIVIL ACTION NO. 12-1893** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Terrance Clennon, born December 1, 1964, filed applications for a period of disability, disability insurance benefits and supplemental security income ("SSI") on March 15, 2010, alleging disability as of February 26, 2010,[1] due to hypertension, high cholesterol, diabetes, and right leg problems.[2]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the

_____

[1]Tr. 169.

[2]Claimant filed previous applications on June 12, 2006, which applications were denied initially and after a hearing.  (Tr. 56-67).

Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[3]

**(1) Records from University Medical Center ("UMC") dated May 13, 2009 to April 6, 2010**. Claimant was treated in the diabetes clinic. (Tr. 191-206). On August 28, 2009, his blood pressure was 138/74. (Tr. 203). He was 5 feet 10 inches tall and weighed 348 pounds. His blood sugar was 108. (Tr. 202). On examination, he had trace edema and positive pedal pulses. (Tr. 203). His foot score was 0.

On January 10, 2010, claimant's blood pressure was 139/78. (Tr. 196). He weighed 335.6 pounds. The assessment was diabetes type II, controlled, hypertension, uncontrolled, and dyslipidemia. He was out of medications.

On April, 6, 2010, claimant's blood pressure was 114/92. (Tr. 192). He weighed 340 pounds. The assessment was diabetes type II, controlled, hypertension, controlled, dyslipidemia, high triglycerides, and morbid obesity.

---

[3]Although only the medical reports relating to the current applications have been summarized, the undersigned reviewed all of the evidence contained in the record.

2

**(2) Consultative Examination by Dr. Scott C. Chapman dated May 26, 2010**.  Claimant was referred for right leg pain, diabetes, hypertension, and hypercholesterolemia.  (Tr. 208).  He stated that he had had right leg pain since he fractured his right ankle five years prior.  He complained of significant pain to the right foot whenever he stood or walked any distance, and gradually increasing right knee pain.

Additionally, claimant had been diagnosed with diabetes approximately 20 years prior, for which he was followed at UMC every three months and was on insulin and oral therapy.  He had had no recent changes to his therapy and stated that his blood sugars had been under fairly good control, running between 120 and 170.  He had had his eye and foot diabetic screenings completed.

Claimant was also diagnosed three years prior with hypertension and hypercholesterolemia, for which he was followed at UMC.  He was on medications for his hypertension and cholesterol.  Since his recent medication change, he had had better control of his blood pressure.  His medications included Carvedilol (hypertension), Clonidine (hypertension), Enalapril (hypertension), Famotidine (acid reflux), Humulin (diabetes), Isosorbide Mononitrate (vasodilator), Lovastatin (cholesterol), and Metformin (diabetes).  (Tr. 209).

3

On examination, claimant's blood pressure was 130/90.  He was 5 feet 11 inches tall, and weighed 329 pounds.  His visual acuity (without glasses) was 20/20.  He was morbidly obese.  (Tr. 210).

Claimant had diffuse, moderate tenderness to palpation over the lateral portion of the right ankle.  He had moderate crepitus on range of motion testing with a mild joint effusion.  He had palpable pulses throughout with no signs of chronic edema.

Neurologically, claimant's cranial nerves were intact.  His reflexes were absent.  Sensation was intact to light touch.  He had 5/5 motor strength throughout.

Grip strength/manual dexterity was within normal limits.  Claimant walked with a mild right limp.  He had no assistive device.

Mental status was normal.

Dr. Chapman's impression was that claimant had had a traumatic right ankle fracture approximately five years prior that required surgery.  He still had hardware in place and has had right ankle pain since that time.  (Tr. 211).  He also developed right knee pain secondary to a chronic limp.  He had more swelling to the right knee with crepitus on range of motion testing.

4

Claimant had normal range of motion in all extremities, including ankles and knees.  (Tr. 212).  Dr. Chapman stated that claimant more likely had significant degenerative changes to the knee secondary to the altered gait caused by the ankle injury.  (Tr. 211).  He opined that claimant needed to have both of these complaints evaluated by an orthopedic surgeon so that further treatment recommendations could be make to try and reduce his symptoms.

Additionally, Dr. Chapman noted that claimant had diabetes, hypertension, and hypercholesterolemia, for which he had adequate followup.  His blood pressure was under good control and normal on that visit.  His diabetes was under fair control, but could be somewhat improved as he still had readings in the 160s and 170s.  He had had a recent increase in his cholesterol medications due to his level still being mild to moderately elevated.  He stated that claimant would need to continue followup for all of these conditions.

**(3) Consultative Examination by Laborde Diagnostics dated June 30, 2010**.  Right knee x-rays showed mild to moderate osteoarthritis of the knee with minor joint space effusion.  (Tr. 214).  Right ankle views were unremarkable.

**(4) Records from UMC dated October 12, 2010**.  Claimant complained that his pain to the knees and ankles was worse with walking for a while.  (Tr. 222).  His blood pressure was 173/88, and he weighed 357 pounds.  Glucose was

151.33.  (Tr. 224).  He had positive pedal pulses, no rashes and no edema.  (Tr. 222).  His foot score was 0.  The assessment was diabetes type II, controlled, hypertension, uncontrolled, dyslipidemia with increased triglycerides, obesity, and tobacco abuse.

**(5) Records from UMC – Ophthalmology dated July 1, 2010 to August 4, 2010**.  Claimant complained of blurred vision.  (Tr. 228).  On examination, his vision was 20/20.

**(6) Claimant's Administrative Hearing Testimony**.  At the hearing on February 10, 2011, claimant testified that he was taking his medicine and checking his blood sugar.  (Tr. 25).  He reported that he watched what he ate carefully.  (Tr. 26).  He reported that his medications made him sleepy.  (Tr. 28).

Claimant testified that he was 5 feet 11 inches tall, and weighed 340 pounds.  (Tr. 26).  He stated that he smoked half a pack per day.  He had a driver's license, but did not drive.  He reported that he had a fourth grade education, and could not read or write much.[4]  (Tr. 32).

As to complaints, claimant testified that his legs hurt when he went to sleep.  (Tr. 28).  He stated that he was taking Ibuprofen for leg pain.  (Tr. 29).  He reported that he walked about 20 minutes or less before his legs and knees started

---

[4]Claimant has past work experience as a construction laborer.  (Tr. 41).

6

to hurt.  (Tr. 27).  He said that he wore an ankle support to take the pressure off of his feet.  (Tr. 29).

Additionally, claimant testified that he felt sick and nauseated when his blood sugar was too high.  (Tr. 30).  He also stated that he had blurred vision about three or four times a week.

Regarding activities, claimant testified that he mostly sat and watched television during the day.  (Tr. 27).  He stated that he did a few things around the house and prepared his own food.

**(7) Administrative Hearing Testimony of Harris N. Rowzie, Vocational Expert ("VE")**.  The ALJ posed a hypothetical in which he asked the vocational expert to assume a claimant with the capacity for light work reduced by the requirement that there be no climbing of ladders or scaffolds, and postural activities occasional.  (Tr. 25).  In response, the VE testified that claimant would not be able to do his prior work, but could work as a fast-food worker, of which there were 2,600,000 jobs nationally and 15,000 statewide.

**(8) The ALJ's Findings**.  Claimant argues that: (1) the ALJ failed to evaluate the effect of his obesity in violation of SSR 02-01p, and (2) the ALJ failed to properly assess his ability to stand/walk, as he failed to conduct the function-by-function analysis mandated by SSR 96-8p.

7

First, claimant argues that the ALJ erred in failing to consider the functional limitations resulting from his obesity in accordance with SSR 02-1p.  The prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  SSR 02-1p.  Section 1.00Q, which was added to the musculoskeletal listing, states that obesity is considered to be a medically determinable impairment, and reminds adjudicators to consider its effects when evaluating disability.  *Id*.; 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 1.00Q.

This provision also reminds adjudicators that the combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  *Id*.  Therefore, "when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators *must* consider any additional and cumulative effects of obesity."  (emphasis added).  *Id*.

Here, the record reflects that the ALJ considered the effects of claimant's obesity on his RFC, as he specifically found his obesity to be a severe impairment.

(Tr. 11).  Additionally, he noted that claimant had a BMI of 51.2.  (Tr. 13).  He determined that claimant's impairments of hypertension, osteoarthritis of the left knee and morbid obesity caused more than minimal limitations on his ability to perform work activity.  (Tr. 11).

Thus, while the ALJ did not specifically mention SSR 02-1p, he did consider the impact of claimant's obesity on his ability to work.  *Hobbs v. Astrue*, 627 F.Supp.2d 719, 727 (W.D. La. 2009) (Drell, J.) (although ALJ did not mention claimant's obesity or discuss the impact of her obesity on her ability to work, he did, in effect, consider the impact of claimant's obesity on her ability to work when he considered the impact of the physical symptoms caused or aggravated by her obesity); *see also Chapa v. Astrue*, 2012 WL 4797117, *15 (S.D. Tex. 2012) ("[b]ecause the ALJ's RFC assessment contemplated all the evidence regarding plaintiff's health, and that evidence necessarily reflected the impact of his weight, the decision was supported by substantial evidence notwithstanding his failure to explicitly discuss plaintiff's obesity.").

Claimant argues that the ALJ failed to evaluate whether claimant's obesity would exacerbate the osteoarthritis of his right knee and further limit his ability to stand and walk.  [rec. doc. 8, p. 4].  However, the ALJ specifically evaluated claimant's knee and ankle complaints, noting that right knee x-rays showed mild

9

to moderate osteoarthritis of the knee with minor joint space effusion.  (Tr. 13, 214).  He also cited Dr. Chapman's opinion in which he assessed no limitations on claimant's ability to function.  (Tr. 211).  Further, the ALJ observed that although claimant walked with a mild right limp, he did not require an assistive device.  (Tr. 14, 210).  See 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 1.00(B)(2)(b)(1) ("[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s)").

Unlike *Hobbs*, where the ALJ failed to mention claimant's obesity at all, the ALJ in this case specifically found claimant's obesity to be a severe impairment. Additionally, he discussed the impact of his impairments of hypertension, osteoarthritis of the left knee, and diabetes on his residual functional capacity. Therefore, although the ALJ failed to specifically discuss SSR 02-1p when making the residual functional capacity determination, claimant has not shown how he was prejudiced by this failure since the effects of his obesity were considered by the ALJ.  *Hobbs*, 627 F.Supp.2d at 727.

Next, claimant argues that the ALJ erred in assessing his residual functional capacity, citing SSR 96-8p, which provides, in pertinent part, as follows:

10

RFC is an assessment of an individual's ability to do sustained
work-related physical and mental activities in a work setting on a
regular and continuing basis.

*           *           *

The RFC assessment is a function-by-function assessment based upon
all of the relevant evidence of an individual's ability to do
work-related activities.

*           *           *

[I]n order for an individual to do a full range of work at a given
exertional level, such as sedentary, the individual must be able to
perform substantially all of the exertional and nonexertional functions
required in work at that level. Therefore, it is necessary to assess the
individual's capacity to perform each of these functions in order to
decide which exertional level is appropriate and whether the
individual is capable of doing the full range of work contemplated by
the exertional level.

*           *           *

The RFC assessment must address both the remaining exertional and
nonexertional capacities of the individual.
Exertional capacity addresses an individual's limitations and
restrictions of physical strength and defines the individual's remaining
abilities to perform each of seven strength demands: Sitting, standing,
walking, lifting, carrying, pushing, and pulling. Each function must
be considered separately.

*           *           *

The RFC assessment must include a narrative discussion describing
how the evidence supports each conclusion, citing specific medical
facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily
activities, observations). In assessing RFC, the adjudicator must

11

discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Claimant asserts that the ALJ failed to provide a narrative discussion describing the evidence which supported his conclusion that claimant could stand/walk for six hours of an eight-hour day.  [rec. doc. 8, p. 7].  However, the record reflects that the ALJ referenced the RFC assessment prepared by the state agency medical consultant, Dr. Charles Lee, who assigned claimant a light RFC. (Tr. 12, 14, 25, 39-41, 47-49, 216).  This satisfies the function-by-function assessment requirement.  *Beck v. Barnhart*, 205 Fed.Appx. 207, 214 (5ᵗʰ Cir. 2006) (*citing Onishea v. Barnhart*, 116 Fed.Appx. 1, 2 (5th Cir. 2004) (stating that an RFC assessment based in part on the function-by-function analysis of claimant's exertional limitations contained in a state examiner's medical report satisfies the legal standard set forth in *Myers v. Apfel*, 238 F.3d 617, 620-621 (5th Cir. 2001) and SSR 96-8p)).

Additionally, the record reflects that the ALJ specifically cited SSR 96-8p in his decision.  (Tr. 10).  Further, he considered all of the medical evidence, including the records from UMC, x-rays, Dr. Chapman's evaluation, and

12

claimant's subjective complaints.  (Tr. 12-14).  Moreover, he analyzed each

impairment in detail.  This complies with the requirements of SSR 96-8p.  *Porter*

*v. Barnhart*, 200 Fed.Appx. 317, 319 (5th Cir. 2006) (finding compliance with SSR

96–8p when the ALJ considers the record as a whole); *Williams v. Astrue*, 2008

WL 4490792, *11 (N.D. Tex. Oct. 3, 2008) ("[a]lthough SSR 96–8p requires a

function-by-function analysis, if the record reflects the ALJ applied the

appropriate standard and considered all the evidence in the record, there is no

error").

　　As an additional ground for finding claimant not disabled, the ALJ cited

claimant's daily activities.  (Tr. 12).  In his Function Report, claimant indicated

that his activities included fixing and riding a bicycle, fishing, and watching

television.  (Tr. 130).  It is appropriate to consider the claimant's daily activities

when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558,

565 (5th Cir. 1995).  Thus, the ALJ's finding that claimant had the RFC to perform

light work is entitled to deference.

　　Finally, claimant disagrees with the ALJ's statement that "even if the

claimant were to be limited to a full range of sedentary work, the outcome of 'not

disabled' would be the same pursuant to Rule 201.25" of the Medical-Vocational

Rules.[5]  (Tr. 15).  He asserts that because he is functionally illiterate, he would be disabled pursuant to Rule 201.17 if he were limited to sedentary work due to his inability to stand/walk for six hours of an eight-hour workday.  [rec. doc. 8, p. 7]. Thus, he argues, the ALJ's failure to properly evaluate his RFC caused prejudice.

For a grid rule to direct a finding of disabled, an individual's age, education, past relevant work, and residual functional capacity must coincide with all of the criteria of a particular rule.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a).  The Rule cited by claimant, 201.17, directs a finding of disabled for a younger individual age 45-49, with an RFC for *sedentary* work, who is illiterate, and has unskilled past relevant work.  (emphasis added).  In this case, the ALJ found that claimant had the RFC to perform light work, which is supported by the record. Therefore, this rule does not apply.  Accordingly, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections

---

[5]Rule 201.25 directs a finding of "not disabled" for a younger individual age 18-44, with a limited or less education (at least literate and able to communicate in English), and who has unskilled or no past relevant work.

with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed May 28, 2013, at Lafayette, Louisiana.

C. Michael Hill
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  5/28/2013
By:  MBD

15